NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-12275

JANE DOE NO. 1[1] & others[2] <u>vs.</u>  SECRETARY OF EDUCATION & others.[3]


Suffolk.     October 2, 2017. - April 24, 2018.

Present:  Gants, C.J., Lenk, Lowy, Budd, Cypher, & Kafker, JJ.


<u>Education</u>, Charter school.  <u>Education Reform Act</u>.
    <u>Constitutional Law</u>, Education, Equal protection of laws,
    Standing.  <u>Jurisdiction</u>, Constitutional question,
    Declaratory relief.  <u>Declaratory Relief</u>.  <u>Practice, Civil</u>,
    Declaratory proceeding, Standing.




<u>Civil action</u> commenced in the Superior Court Department on September 15, 2015.

A motion to dismiss was heard by <u>Heidi E. Brieger</u>, J.

The Supreme Judicial Court granted an application for direct appellate review.

---

[1] A minor, by her parent and next friend.

[2] Jane Doe No. 2 and John Doe Nos. 1, 2, and 3, minor children, each by their parent and next friend.

[3] Chair of the board of elementary and secondary education; commissioner of elementary and secondary education; and members of the board of elementary and secondary education.

Kevin P. Martin (Paul F. Ware, Jr., also present) for the plaintiffs.

Robert E. Toone, Assistant Attorney General (Juliana deHaan Rice & Julia Kobick, Assistant Attorneys General, also present) for the defendants.

Melissa C. Allison for Savina Tapia & others.

Ira Fader, Alan H. Shapiro, & John M. Becker, for Massachusetts Teachers Association, amicus curiae, submitted a brief.

Brian C. Broderick & Ryan P. McManus, for Pioneer Institute, Inc., & others, amici curiae, submitted a brief.

BUDD, J.  Five students who attend public schools in the city of Boston filed a complaint in the Superior Court against the Secretary of Education, the chair and members of the board of secondary and elementary education, and the Commissioner of Education (commissioner), alleging that the charter school cap under G. L. c. 71, § 89 (i), violates the education clause and the equal protection provisions of the Massachusetts Constitution because the students were not able to attend public charter schools of their choosing.  A judge of that court allowed the defendants' motion to dismiss.  We affirm the judgment of dismissal and conclude, as did the motion judge, that the plaintiffs have failed to state a claim for relief under either provision.[4]

---

[4] We acknowledge the amicus briefs submitted by the Massachusetts Teachers Association; Pioneer Institute, Inc., Cheryl Brown Henderson, and The Black Alliance for Educational Options; and Savina Tapia, Samuel Ding, N.H., Z.L., A.Q., T.K., B.H, The New England Area Conference of National Association for

     Background.  1.  Statutory framework and history.  Twenty-
five years ago, the Legislature enacted the Education Reform Act
of 1993 (1993 Act).  St. 1993, c. 71.  The 1993 Act "entirely
revamped the structure of funding public schools and
strengthened the board [of education]'s authority to establish
Statewide education policies and standards, focusing on
objective measures of student performance and on school and
district assessment, evaluation and accountability."[5]  Hancock v.
Commissioner of Educ., 443 Mass. 428, 437 (2005) (Marshall,
C.J., concurring).  Among other things, the 1993 Act added G. L.
c. 71, § 89 (charter school statute), authorizing charter
schools to operate in the Commonwealth to encourage innovation
in the educational realm.  St. 1993, c. 71, § 55.

     Policymakers established charter schools as a reaction to
what was seen as a traditional public school system resistance

---

the Advancement of Colored People, Boston Branch of the
N.A.A.C.P., and The Boston Education Justice Alliance.

     [5] The Education Reform Act of 1993 (1993 Act) was enacted
with the intent "to ensure:  (1) that each public school
classroom provides the conditions for all pupils to engage fully
in learning as inherently meaningful and enjoyable activity
without threats to their sense of security or self-esteem, (2) a
consistent commitment of resources sufficient to provide a high
quality public education to every child, (3) a deliberate
process for establishing and achieving specific educational
goals for every child, and (4) an effective mechanism for
monitoring progress toward those goals and for holding educators
accountable for their achievement."   St. 1993, c. 71, § 27.
See G. L. c. 69, § 1.

to innovative education methods. As the 1993 Act was making its way through the Legislature, one policymaker publicly opined that charter schools were needed because teachers wanted to bring creative teaching styles to the public schools, but principals, superintendents, and school committees often blocked their innovations: "The current system is too rigid, too inflexible[,] and it doesn't adopt to change quick enough to meet the needs of students." State House News Service, Charter Schools (Feb. 24, 1993) (statement of Undersecretary of Education for Policy and Planning Michael Sentance). Ultimately, charter schools were intended to provide "a laboratory for testing different methods and those methods that proved useful . . . would be replicated" in traditional public schools. Id. (statement of Senate Ways and Means Chairman Thomas Birmingham). A bill summary accompanying the conference committee report described charter schools as "laboratories of change, allowing for experimentation to encourage creative ways of addressing the needs of the children of the Commonwealth."[6]

---

[6] The 1993 Act states: "The purposes for establishing charter schools are: (1) to stimulate the development of innovative programs within public education; (2) to provide opportunities for innovative learning and assessments; (3) to provide parents and students with greater options in choosing schools within and outside their school districts; (4) to provide teachers with a vehicle for establishing schools with alternative, innovative methods of educational instruction and school structure and management; (5) to encourage performance-

The Education Reform Act of 1993, Conference Committee Report
Highlights (May 24, 1993).

There are two types of charter schools:  "commonwealth"
charter schools and "Horace Mann"[7] charter schools.  G. L. c. 71,
§ 89 (a) and (c).  Horace Mann charter schools are subject to
more statutory requirements than commonwealth charter schools.
See id. at § 89 (c).  Both types of schools operate under
charters granted by the board of elementary and secondary
education (board) and each is managed by a board of trustees.
Id.  However, a Horace Mann charter school must be "approved by
the school committee and the local collective bargaining unit in
the district where the school is located," whereas a
commonwealth charter school operates independently of the local

_____

based educational programs and; (6) to hold teachers and school
administrators accountable for students' educational outcomes."
St. 1993, c. 71, § 55.  In 1997, the Legislature added an
additional purpose:  "to provide models for replication in other
public schools."  St. 1997, c. 46, § 2.   See G. L. c. 71, § 89
(b).

[7] Horace Mann was the President of the Senate in 1836 and
1837 when the Legislature first created the board of education
and tasked its Secretary with reporting to the Legislature and
the public information about best practices in education.  See
St. 1837, c. 241 (An Act relating to common schools); Manual for
the General Court, 2013-2014, at 340.  Mann served as the first
Secretary of the board of education until 1848.  6 Dictionary of
American Biography 241-242 (1961).  Mann's influence led to,
among other accomplishments, extending the length of the school
year, significantly increasing spending and appropriations for
schools, raising salaries for schoolteachers, enriching
curricula, and placing professional training of teachers on a
firmer basis.  Id. at 242.

school committee and local collective bargaining unit.[8]  Id.  The

Department of Elementary and Secondary Education (department)[9]

now identifies these "standard" Horace Mann schools as Horace

Mann I schools.  See 603 Code Mass. Regs. § 1.04(1)(a) (2014).

Additionally, charter schools may operate as Horace Mann II or

Horace Mann III charter schools.  See G. L. c. 71, § 89 (c) &

(i); 603 Code Mass. Regs. § 1.04(1)(a).  The latter two schools

are subject to requirements that are somewhat different from

those to which the Horace Mann I schools are subject.  See G. L.

---

[8] Although the legislative history is silent on this point, the Legislature's decision in 1997 to rename the charter schools set forth in the 1993 Act as "commonwealth" charter schools reflects the fact that they are chartered and regulated only by the State and have complete autonomy from local control.  See St. 1997, § 2; G. L. c. 71, § 89.

[9] The board of elementary and secondary education (board) is established under G. L. c. 15, § 1E.  In contrast, the Department of Elementary and Secondary Education (department) is established under G. L. c. 15, § 1, and is "under the supervision and management of the commissioner of elementary and secondary education" (commissioner).  G. L. c. 15, § 1.  The commissioner is "secretary to the board, its chief executive officer, and the chief [S]tate school officer for elementary and secondary education."  Id. at § 1F.  Although the Secretary of Education appoints the commissioner, the Secretary may only appoint a candidate who has been recommended to him or her by a two-thirds majority of the board.  Id.  The board may also remove the commissioner.  Id.  The Legislature often assigns the board, the commissioner, and the department separate statutory duties.  See, e.g., G. L. c. 69, §§ 1A, 1B, 1J.  However, "[t]he board may delegate its authority or any portion thereof to the commissioner whenever in its judgment such delegation may be necessary or desirable."  G. L. c. 15, § 1F.

c. 71, § 89 (c) & (i), as amended by St. 2010, c. 12, § 7; 603 Code Mass. Regs. § 1.04(1)(a).[10]

Commonwealth and Horace Mann charter schools are also funded differently. See 603 Code Mass. Regs. § 1.07 (2014). Horace Mann charter schools operate under budgets determined and annually approved by the local school committee. G. L. c. 71, § 89 (w). For commonwealth charter schools, the department calculates a tuition payment for each district sending students to the school based on a statutory formula designed "to reflect, as much as practicable, the actual per pupil spending amount that would be expended in the district if the students attended the district schools." Id. at § 89 (ff). The State treasurer pays these amounts to the schools and then reduces education and other aid payments to the sending districts by the same amounts. Id. See 603 Code Mass. Regs. § 1.07(2)(d).

---

[10] Creating a Horace Mann II charter school involves a conversion of an existing public school but does not require approval of the local collective bargaining unit. G. L. c. 71, § 89 (c); 603 Code Mass. Regs. § 1.04(1)(a)(2) (2014). Horace Mann III schools do not need an agreement with the local collective bargaining unit prior to approval by the board. G. L. c. 71, § 89 (i) (1); 603 Code Mass. Regs. § 1.04(1)(a). Horace Mann III schools must "develop a memorandum of understanding with the school committee and the local union regarding any waivers to applicable collective bargaining agreements." G. L. c. 71, § 89 (i) (1). "[I]f an agreement is not reached on the memorandum of understanding at least 30 days before the scheduled opening of the school the charter school shall operate under the terms of its charter until an agreement is reached." Id.

Since 1993, only a limited number of charter schools have been authorized under the statute.  See St. 1993, c. 71, § 55; G. L. c. 71, § 89 (i).  One explanation for the Legislature's decision to limit charter schools is that the limited funds of local school districts are allocated to charter schools and away from traditional public schools each time charter schools expand.  See G. L. c. 71, § 89 (w) & (ff).[11]  Widespread concern over the impact of charter schools on public school district revenues supports the conclusion that a primary purpose of caps on charter schools is to limit this impact.

---

[11] This reasoning is supported by the legislative history of statutes raising the charter schools cap.  For example, in 2000, members of the House of Representatives engaged in a vigorous debate over a bill that would become a  statute to increase the charter school cap, discussed infra.  During debate, many legislators expressed their concerns with the financial effect of charter schools on traditional public schools, with one legislator noting that "[w]e will not take the money away from struggling school systems."  State House News Service (House Sess.), June 21, 2000 (statement by Representative Byron Rushing).  See id. (statement by Representative Ronny M. Sydney that charter schools "are good environments, but we cannot take from the public schools to give to them"); id. (statement by Representative Anne M. Paulsen that charter schools are "undermining our public schools," and as result of expansion, "education in public schools will be undercut"); id. (statement by Representative Philip Travis that by expanding charter schools, "[w]e are stealing from the towns").  Opponents of 2016 ballot question 2, discussed infra, argued to voters:  "Every time a new charter school opens or expands, it takes funding away from the public schools in that district."  Massachusetts Information for Voters, 2016 Ballot Questions, State Elections (Nov. 8, 2016), at 6 (2016 Ballot Questions).

As currently written, the charter school statute limits commonwealth charter schools in two ways:  a net school spending cap, which applies only to commonwealth charter schools, and a limit on the total number of charter schools permitted to operate in the Commonwealth.[12]  See G. L. c. 71, § 89 (i).  The net school spending cap limits the amount of school district money that must be set aside for commonwealth charter schools (and therefore limits the amount of commonwealth charter school seats in a district).  See id. at § 89 (i) (2).  Net school spending comprises all school district spending on public education, from both State aid and local sources.[13]  See G. L.

---

[12] Horace Mann II charter schools, which are schools converted from existing public schools, are exempt from any cap on the number of charter schools.  See G. L. c. 71, § 89 (c).

[13] Net school spending is defined as

"the total amount spent for the support of public education, including teacher salary deferrals and tuition payments for children residing in the district who attend a school in another district or other approved facility, determined without regard to whether such amounts are regularly charged to school or non-school accounts by the municipality for account purposes; provided, however, that net school spending shall not include any spending for long term debt service, and shall not include spending for school lunches, or student transportation.  Net school spending shall also not include tuition revenue or revenue from activity, admission, other charges or any other revenue attributable to public education.  Such revenue will be made available to the school district which generated such revenue in addition to any financial resources made available by municipalities or state assistance.  The department of education, in consultation with the department of revenue shall promulgate regulations

c. 70, § 2. For most school districts in the Commonwealth, the statute limits net school spending to nine per cent of total public education spending. G. L. c. 71, § 89 (i) (2). However, in districts that the board has designated as the lowest performing ten per cent of school districts Statewide, the net school spending cap is eighteen per cent of total public education spending. Id.[14] The charter school statute also limits the total number of charter schools permitted to operate in the Commonwealth to 120, only seventy-two of which may be commonwealth charter schools. See G. L. c. 71, § 89 (i) (1).

The history of charter school caps in Massachusetts encompasses multiple legislative enactments spanning several decades. The Legislature has steadily increased the number of permissible charter schools and charter school seats. See St.

_____

to ensure a uniform method of determining which municipal expenditures are appropriated for the support of public education and which revenues are attributable to public education in accordance with this section. The regulations shall include provisions for resolving disputes which may arise between municipal and school officials." G. L. c. 70, § 2.

[14] General Laws c. 71, § 89 (i) (2), provides: "In any fiscal year, no public school district's total charter school tuition payment to commonwealth charter schools shall exceed [nine] per cent of the district's net school spending; provided, however, that a public school district's total charter tuition payment to charter schools shall not exceed [eighteen] per cent of the district's net school spending if" the school fails certain student performance criteria for a number of consecutive years as determined by the board.

1993, c. 71, § 55 (limiting number of charter schools in each city or town and total number of students attending charter schools in Commonwealth to no more than three-quarters of one per cent of public school students; and permitting no more than twenty-five charter schools to operate in Commonwealth at any one time); St. 1997, c. 46, § 2 (increasing total number of charter schools permitted to operate and total number of Commonwealth's public school students permitted to attend charter schools, and setting net school spending cap at six per cent for all districts); St. 2000, c. 227, § 7 (increasing total number of charter schools permitted, but authorizing only seven each year until reaching new total cap; increasing total number of public education students permitted to attend charter schools; and increasing net school spending cap to nine per cent); St. 2010, c. 12, § 7 (increasing net school spending cap to eighteen per cent for commonwealth charter schools located in districts designated as having student performance in lowest ten per cent Statewide,[15] eliminating cap on total number of Commonwealth's public school students permitted to attend charter schools, and exempting Horace Mann II schools from all caps).

---

[15] In those districts, the Achievement Gap Act of 2010 phased in increased school-district funding of commonwealth charter schools between fiscal years 2011 and 2017. St. 2010, c. 12, § 9.

Whether the charter school cap should be lifted continues to be debated vigorously in the Commonwealth. Although the Legislature has not increased the caps since 2010, both chambers have frequently considered and voted on measures that would have done so. See 2016 Senate Doc. No. 2203, § 93; 2016 Senate J., Uncorrected Proof (Apr. 7, 2016); 2014 Senate Doc. No. 2262; 2014 House Doc. No. 4108; 2014 House J. 1396-1400; 2014 Senate J., Uncorrected Proof (July 16, 2014). On November 8, 2016, voters considered and rejected ballot question 2, which would have permitted up to twelve new charter schools or enrollment expansions in existing charter schools each year.[16]

2. Factual and procedural history. The following facts are taken from the plaintiffs' complaint. The plaintiffs are five students who attend, or are assigned to attend, schools in the city of Boston. Each plaintiff attends a school that is designated as a level three or level four school, that is, a school that is in the bottom fifth of all schools Statewide.[17]

---

[16] The ballot question was rejected by sixty-two per cent of voters (2,025,840 to 1,243,665) voting on the question, with three per cent of Massachusetts voters (109,296) not voting on the measure. See Secretary of the Commonwealth, The Elections Division, Massachusetts Election Statistics 2016, Pub. Doc. No. 43, at 529 (Election Statistics 2016).

[17] The department classifies schools by level based on performance for purposes of accountability and providing assistance to improve student achievement. 603 Code Mass. Regs. § 2.03 (2012). The department may designate a school at level

Few students in each of the plaintiffs' schools have achieved a level of proficiency or above on subjects tested by the Massachusetts Comprehensive Assessment System (MCAS), which include English language arts, mathematics, and science.[18]  Each

---

three if it is in the lowest-performing twenty per cent of schools.  Id. at § 2.04 (2017).  The commissioner may designate a subset of the lowest performing twenty per cent of schools as level four or level five schools.  See G. L. c. 69, § 1J (a); 603 Code Mass. Regs. § 2.05(2)(a)(2017).  The commissioner's decision to designate a school at level four is based on indicators of school performance set forth in the regulation. See 603 Code Mass. Regs. § 2.05(2)(b).  Superintendents of school districts containing a level four school must develop a turnaround plan, approved by the commissioner, designed to improve the school's performance.  See G. L. c. 69, § 1J; 603 Code Mass. Regs. § 2.05(5).  The commissioner may place a level four school in level five if performance-improvement attempts have failed.  See 603 Code Mass. Regs. § 2.06(2) (2017).  If the commissioner places a school in level five, the commissioner may select an external receiver to operate the school.  See G. L. c. 69, § 1J (r); 603 Code Mass. Regs. § 2.06(5).  Not more than four per cent of the total number of public schools may be in levels four and five, taken together, at any given time.  See G. L. c. 69, § 1J (a); 603 Code Mass. Regs. § 2.05(2)(c).

[18] The Massachusetts Comprehensive Assessment System (MCAS) is a standardized test that the Commonwealth uses to assess student performance at public schools.  See Student No. 9 v. Board of Educ., 440 Mass. 752, 753 (2004)  The four possible achievement levels on MCAS are advanced, proficient, needs improvement, or failing.  See id. at 758-759 (2004); FY2015 Annual Report, Massachusetts Board of Elementary and Secondary Education (Jan. 2016) Appx. 2.

The complaint presented detailed statistics showing the low performance of the students in the plaintiffs' schools on the MCAS test.  In 2014, the percentage of students who attended the plaintiffs' schools scoring as proficient or higher in the English language arts ranged from a high of thirty-nine per cent to a low of ten per cent; in mathematics the high was thirty-

applied to attend a charter school, but failed to secure a seat through the lottery.[19]

In September, 2015, the plaintiffs commenced an action in the Superior Court seeking declaratory and injunctive relief. The plaintiffs claimed that their existing schools do not provide a constitutionally adequate education and that the defendants' enforcement of G. L. c. 71, § 89 (i), violates the education clause and the equal protection provisions of the

---

seven per cent and the low was fifteen per cent; and in science the high was thirty per cent and the low was ten per cent.

Moreover, in each of the last five years no more than thirty-five per cent of students in John Doe No. 1's school tested as proficient or higher in any subject.

[19] Where there are fewer seats available at a charter school than eligible students who apply to attend, the charter school must hold an admissions lottery to enroll students. See G. L. c. 71, § 89 (n); 603 Code Mass. Regs. § 1.05(6)(c), (7)(a). John Doe No. 1 applied to attend Edward Brooke East Boston Public Charter School. Jane Doe No. 1 applied to attend the Match Charter Public School. John Doe No. 2 applied to attend the Edward Brooke Roslindale Public Charter School. John Doe No. 3 applied to attend "multiple charter schools in each of the last two years." Jane Doe No. 2 applied to attend multiple public charter schools. In their brief, the plaintiffs state that since their complaint was filed, only one plaintiff, Jane Doe No. 1, again entered and lost a charter school lottery and remains in the school to which she was assigned in 2015. During the pendency of the litigation, John Doe No. 1's family has moved outside Boston to ensure that their children could obtain an adequate education. John Doe No. 2 did not enter the most recent charter school lottery. John Doe No. 3 was accepted to a charter school in Boston after another charter school lottery. Jane Doe No. 2 applied and was accepted to a selective Boston district high school for the school year beginning in 2016.

Massachusetts Constitution.[20]  In their complaint, the plaintiffs sought to represent a class including themselves and all other children attending or assigned to attend constitutionally inadequate schools in Boston who have applied to public charter schools, but have failed to gain entry via the lottery.

In 2015, the defendants filed a motion to dismiss the plaintiffs' complaint.  The motion judge granted the motion, concluding that, although an actual controversy between the parties existed and the plaintiffs had standing to bring their claims against the defendants, the plaintiffs had failed to state a claim under either the education clause or the equal protection provisions of the Massachusetts Declaration of Rights.  The plaintiffs appealed, and we allowed their application for direct appellate review.

Discussion.  "We review the allowance of a motion to dismiss de novo."  Curtis v. Herb Chambers I-95, Inc., 458 Mass. 674, 676 (2011).  "For purposes of that review, we accept as true the facts alleged in the plaintiffs' complaints and any exhibits attached thereto, drawing all reasonable inferences in

---

[20] The plaintiffs' complaint also asserts a cause of action under the due process and liberty provisions of the Massachusetts Declaration of Rights.  However, as they failed to argue these claims in their brief before this court, we do not address them.  See Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975); Doe v. New Bedford Hous. Auth., 417 Mass. 273, 275 n.3 (1994).

the plaintiffs' favor." Revere v. Massachusetts Gaming Comm'n, 476 Mass. 591, 595 (2017). Before turning to the substance of the plaintiffs' claims, we must determine whether there is jurisdiction to adjudicate them.

1. Jurisdiction. "[A] plaintiff seeking declaratory relief must demonstrate not only the existence of an actual controversy but also 'the requisite legal standing to secure its resolution'" (citations omitted). Entergy Nuclear Generation Co. v. Department of Envtl. Protection, 459 Mass. 319, 326 (2011). "The purpose of both the actual controversy and the standing requirements is to ensure the effectuation of the statutory purpose of G. L. c. 231A, which is to enable a court 'to afford relief from . . . uncertainty and insecurity with respect to rights, duties, status and other legal relations.'" Massachusetts Ass'n of Indep. Ins. Agents & Brokers v. Commissioner of Ins., 373 Mass. 290, 292 (1977), quoting G. L. c. 231A, § 9, inserted by St. 1945, c. 582, § 1. The questions whether an actual controversy and standing exist are closely related in actions for declaratory relief. Id., citing South Shore Nat'l Bank v. Board of Bank Incorporation, 351 Mass. 363, 366-367 (1966). In declaratory judgment actions, both requirements are liberally construed. " Massachusetts Ass'n of Indep. Ins. Agents & Brokers, supra at 293. Notwithstanding the

defendants' arguments to the contrary, the plaintiffs have adequately demonstrated both an actual controversy and standing.

a.  Actual controversy.  The plaintiffs here assert that the "actual controversy" here is the fact that they are assigned to inadequate schools and the cap restricts the number of commonwealth charter schools, which, in turn, impedes the plaintiffs' access to an adequate education.[21]  The defendants argue that because (1) there is no limit on the number of Horace Mann II charter schools, (2) the numerical cap for Horace Mann I and III charter schools has not been reached, and (3) the net school spending cap does not apply to Horace Mann charter schools, the plaintiffs have not presented an "actual controversy."  Here, however, we agree with the motion judge that when the plaintiffs refer to "public charter schools" in their complaint, their focus is solely on commonwealth rather than Horace Mann charter schools and they implicitly contend

---

[21] The complaint contains claims that G. L. c. 71, § 89 (i), is unconstitutional because of its charter school cap.  Section 89 (i) presently contains two types of commonwealth charter school caps, or limits on commonwealth charter schools.  There is a limit on the total number of charter schools in the Commonwealth.  G. L. c. 71, § 89 (i).  There also is the net school spending cap, which limits the amount of any school district's total payment to commonwealth charter schools to a percentage of that district's net school spending in any fiscal year.  Id.  The net school spending cap does not apply to Horace Mann charter schools.  Id.  In 2010, the Legislature eliminated another cap that had limited the State's total charter school population to four per cent.  See St. 2010, c. 12, § 7; St. 2000, c. 227, § 2.

that charter operators are seeking to expand as commonwealth, not Horace Mann, charter schools.[22]

One or more of the differences in regulatory treatment of commonwealth charter schools and Horace Mann charter schools under G. L. c. 71, § 89, may explain why charter school operators have opted to apply for and operate commonwealth charter schools in much greater numbers than Horace Mann charter schools. At any rate, the limit on commonwealth charter funding

_____

[22] The plaintiffs provided evidentiary support for their contention that charter school operators would open more commonwealth charter schools if the net school spending cap were increased. The plaintiffs submitted a memorandum entitled Charter Schools -- Amendments for Boston Schools, authored by the commissioner and dated February 12, 2016, that was sent to the members of the board, and that noted that existing commonwealth charter schools requested significantly more new seats at their schools in Boston than can be accommodated under the net school spending cap. Id. at 1. The memorandum pointed out that "existing [commonwealth charter] schools requested 2,701 new seats in Boston." Id. at 1. However, it also indicated that "[u]nder the eighteen per cent [net school spending cap] for Boston, the [d]epartment estimates that [only] approximately 1,275 seats remain." Id. at 2. As a result, the memorandum provides recommendations regarding which commonwealth charter schools within Boston should have their requests for additional seats granted and which should not, while ensuring compliance with the net school spending cap. Id. at 1, 6. The commissioner further noted that applications for more seats "came from schools with track records of performance that, if more seats were available in Boston, have the potential to be strong candidates for my recommendation[,]" id. at 6, but that "[b]arring any reallocation of unused seats, I anticipate that no additional increases in enrollment in [c]ommonwealth charter schools in Boston will be available in future years under the current statute." Id. at 2. No evidence in the record suggests that the operators of these schools or others are considering opening Horace Mann charter schools in Boston.

in the charter school statute has been reached in the plaintiffs' district.  We need not divine the reason why charter operators favor the commonwealth charter school framework in order to conclude that, for the purposes of determining whether an actual controversy exists, the plaintiffs have an identifiable interest in the opportunity to attend a commonwealth charter school that is actually limited by the caps in the charter school statute.  We conclude, as did the motion judge, that the plaintiffs have presented an actual controversy. See G. L. c. 231A, § 1.

b.  Standing.  A party has standing when it can allege an injury within the area of concern of the statute, regulatory scheme, or constitutional guarantee under which the injurious action has occurred.  School Comm. of Hudson v. Board of Educ., 448 Mass. 565, 579 (2007), quoting Enos v. Secretary of Envtl. Affairs, 432 Mass. 132, 135-136 (2000).  "[I]t is not enough that the plaintiff be injured by some act or omission of the defendant; the defendant must additionally have violated some duty owed to the plaintiff."  Penal Insts. Comm'r for Suffolk County v. Commissioner of Correction, 382 Mass. 527, 532 (1981), quoting L.H. Tribe, American Constitutional Law § 3-22, at 97-98 (1978).  The plaintiffs have set forth sufficient facts to demonstrate standing as to both counts in their complaint.

First, the plaintiffs claimed their injury, i.e., an inadequate public education, falls within the area of concern of the education clause of the Massachusetts Constitution. The education clause imposes a duty on the Commonwealth to provide an adequate public education to its schoolchildren. McDuffy v. Secretary of Executive Office of Educ., 415 Mass. 545, 618-619, 621 (1993).

Second, the equal protection principles of the Massachusetts Constitution prohibit lawmakers from treating similarly-situated citizens differently without adequate justification. See Goodridge v. Department of Pub. Health, 440 Mass. 309, 330 (2003); Massachusetts Fed'n of Teachers, AFT, AFL-CIO v. Board of Educ., 436 Mass. 763, 778-779 (2002). Thus, the plaintiffs' alleged equal protection injury -- discrimination in the provision of public education without adequate justification -- is within the area of concern of the Constitution's equal protection guarantee. The plaintiffs therefore have standing to bring their declaratory judgment action.

2. Substantive claims. "To survive a motion to dismiss, the facts alleged must 'plausibly suggest[] (not merely be consistent with) an entitlement to relief.'" Edwards v. Commonwealth, 477 Mass. 254, 260 (2017), quoting Iannacchino v. Ford Motor Co., 451 Mass. 623, 636 (2008). "Factual allegations

must be enough to raise a right to relief above the speculative level . . . [based] on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Iannacchino, 451 Mass. at 636, quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). "[W]hen the allegations in a complaint, however true, could not raise a claim of entitlement to relief, 'this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court.'" Bell Atl. Corp., 550 U.S. at 558, quoting 5 C.A. Wright & A.R. Miller, Federal Practice and Procedure § 1216, at 233-234 (3d ed. 2004).

a. Education clause claim. The plaintiffs allege that they attend noncharter public schools that are constitutionally inadequate. They assert that their assignment to inadequate schools is caused by a statutory provision prohibiting more than eighteen per cent of their school district's funding from being allocated to commonwealth charter schools. See G. L. c. 71, § 89 (i). Accordingly, they contend that the charter school cap statute violates the education clause.

We agree with the plaintiffs that the education clause imposes an affirmative duty on the Commonwealth to provide a level of education in the public schools for the children there

enrolled that qualifies as constitutionally "adequate."[23]  See

McDuffy, 415 Mass. at 618-619, 621.  However, we conclude that

they have failed to state a claim under the education clause

because, to state a claim, the plaintiffs would need to plead

---

[23] The Commonwealth's duty requires the Commonwealth to have a State public education plan to ensure that our children are educated in a manner so that they possess capabilities that "accord with our Constitution's emphasis on educating our children to become free citizens on whom the Commonwealth may rely" to ensure the functioning of our democracy and society. McDuffy v. Secretary of the Executive Office of Educ., 415 Mass. 545, 619 (1993).  The McDuffy court described those capabilities as follows:

> "(i) sufficient oral and written communication skills to enable students to function in a complex and rapidly changing civilization; (ii) sufficient knowledge of economic, social, and political systems to enable students to make informed choices; (iii) sufficient understanding of governmental processes to enable the student to understand the issues that affect his or her community, state, and nation; (iv) sufficient self-knowledge and knowledge of his or her mental and physical wellness; (v) sufficient grounding in the arts to enable each student to appreciate his or her cultural and historical heritage; (vi) sufficient training or preparation for advanced training in either academic or vocational fields so as to enable each child to choose and pursue life work intelligently; and (vii) sufficient level of academic or vocational skills to enable public school students to compete favorably with their counterparts in surrounding states, in academics or in the job market."

Id. at 618-619, quoting Rose v. Council for Better Educ., Inc., 790 S.W.2d 186, 212 (Ky. 1989).

The above-listed aptitudes comprise "broad guidelines." McDuffy, supra at 618.  See Hancock, 443 Mass. at 455 n.29 (Marshall, C.J., concurring).  Significantly, the capabilities considered to be essential "necessarily will evolve together with our society." McDuffy, supra at 620.

facts suggesting not only that they have been deprived of an adequate education but also that the defendants have failed to fulfil their constitutionally prescribed duty to educate. See Hancock, 443 Mass. at 435 (Marshall, C.J., concurring); McDuffy, 415 Mass. at 621. Here, the plaintiffs have fulfilled the former but not the latter condition.

To allege that the Commonwealth has failed to fulfil its duty to educate, plaintiffs must plead sufficient facts that, accepted as true, demonstrate that the Commonwealth's extant public education plan does not provide reasonable assurance of an opportunity for an adequate education to "all of its children, rich and poor, in every city and town," McDuffy, 415 Mass. at 606, over a reasonable period of time, or is otherwise "arbitrary, nonresponsive, or irrational." See Hancock, 443 Mass. at 435 (Marshall, C.J., concurring); id. at 457, 459; Doe v. Superintendent of Schs. of Worcester, 421 Mass. 117, 129 (1995); McDuffy, supra at 606, 618, 621. Here, although the plaintiffs' complaint supports the claim that the education provided in their schools is, at the moment, inadequate,[24] they

---

[24] For example, the plaintiffs claim substandard performance on standardized student performance assessment examinations in their schools. Although sufficient for the motion to dismiss stage, we note that performance levels on such examinations should be relied on with caution as evidence of a constitutionally inadequate education without an examination of other factors that may bear on test results and an examination

have not alleged any facts to support a claim that the Commonwealth's public education plan does not provide reasonable assurance of improvements for their schools' performance over a reasonable period of time. As was the case in Hancock, there may be moments in time where particular public schools are not providing an adequate education to their students. See Hancock, supra at 457 (Marshall, C.J., concurring) (although some students were not at full academic competency, coordinate branches were satisfactorily acting on their education clause duty). This alone is insufficient to support a claim that the Commonwealth has failed to fulfil its constitutional obligation.[25] See id.

---

of whether those test results actually measure whether an education is constitutionally adequate. McDuffy, 415 Mass. at 618-619.

[25] In describing the differences between the public education system under review in McDuffy with the system under review in Hancock, the plurality in Hancock noted that the latter's "shortcomings, while significant in the focus districts, do not constitute the egregious, Statewide abandonment of the constitutional duty identified in" McDuffy. Hancock, 443 Mass. at 433 (Marshall, C.J., concurring). We disagree with the motion judge that this language implies the need for a "Statewide abandonment" of the education clause duty in order to state an education clause claim. If the Commonwealth's public education plan were to abandon students attending schools in a particular city or town, those students may seek recourse under the clause. See McDuffy, 415 Mass. at 618 ("The crux of the Commonwealth's duty lies in its obligation to educate all of its children").

In order to establish that their schools are performing poorly, the plaintiffs utilize classifications established by the department's regulations classifying schools based on performance in order to "hold districts and schools accountable for educating their students well and to assist them in improving the education they provide."  603 Code Mass. Regs. § 2.01(3) (2012).  See id. at § 2.02 (defining "[l]evels 1 through 5" as "the levels in the [d]epartment's framework for district accountability and assistance . . . in which schools and districts in the Commonwealth are placed"); id. at § 2.03(1).[26] See note 17, supra.  Although the plaintiffs allege that their education is inadequate because two of their schools have been designated by the Commonwealth as level four schools and three have been designated as level three schools, they do not claim that the Commonwealth's framework for ensuring that all schools, including the plaintiffs', meet constitutional

_____

[26] The department's regulations provide that the "[d]epartment shall implement a five-level system for school accountability and assistance, approved by the [b]oard and known as the framework for district accountability and assistance, for the purpose of improving student achievement.  Both the priority for assistance and the degree of intervention shall increase from [l]evel 1 to [l]evel 5, as the severity and duration of identified problems increase.  Under the framework, districts shall hold their schools accountable for educating their students well and assist them in doing so; the [d]epartment shall hold districts accountable for both of these functions and assist them in fulfilling them" (emphases added).  603 Code Mass. Regs. § 2.03(1) (2012).

educational adequacy fails to satisfy the requirements of the education clause. They instead focus solely on the charter school cap. As there is no constitutional entitlement to attend charter schools, and the plaintiffs' complaint does not suggest that charter schools are the Commonwealth's only plan for ensuring that the education provided in the plaintiffs' schools will be adequate, the Superior Court judge did not err in dismissing the plaintiffs' education clause claim.

Furthermore, even if the plaintiffs had successfully stated a claim under the education clause, the specific relief that they seek would not be available. The education clause provides a right for all the Commonwealth's children to receive an adequate education, not a right to attend charter schools. "[T]he education clause leaves the details of education policymaking to the Governor and the Legislature." Hancock, 443 Mass. at 454 (Marshall, C.J., concurring). Although a violation of the education clause may result in judicial action to remedy the wrong, the clause does not permit courts to order "fundamentally political" remedies or "policy choices that are properly the Legislature's domain." Id. at 460.

Thus, here, although the remedy the plaintiffs seek by way of this action, i.e., expanding access to charter schools, could potentially help address the plaintiffs' educational needs, other policy choices might do so as well, such as taking steps

to improve lower-performing traditional public schools.  There may be any number of equally effective options that also could address the plaintiffs' concerns; however, each would involve policy considerations that must be left to the Legislature.  See id. at 460.  Whether to divert an increased amount of school district funds from traditional public schools to charter schools to comply with the education clause mandate is a choice for the Legislature, not for the courts.[27]  See id.  See also id. at 484 (Greaney, J., dissenting) (acknowledging "the disagreement between competent experts on how best to remediate a nonperforming or poorly-performing school district").

b.  Equal protection claim.  "The Declaration of Rights of the Constitution of this Commonwealth in arts. 1, 6, 7, [and] 10 . . . contain[s] ample guarantees for equal protection [of the laws]."  Brest v. Commissioner of Ins., 270 Mass. 7, 14 (1930).  The plaintiffs claim the charter school cap violates their right to equal protection because it creates two classes of children: those who are guaranteed to receive an opportunity for an adequate education because all traditional public schools in

_____

[27] In fact, as set out in the first section of this opinion, not only has the Legislature modified the commonwealth charter school cap numerous times since 1993, the voters of the Commonwealth considered and rejected an initiative petition in November, 2016, that would have provided the similar policy relief that the plaintiffs request here under the education clause.  See St. 2010, c. 12, § 7; St. 2000, c. 227, § 2; St. 1997, c. 46, § 2; Election Statistics 2016, supra at 529.

their districts provide one, and those in districts with many failing schools whose educational prospects are determined by a lottery. Even assuming that the statute at issue meets the requirement of being discriminatory for the purposes of an equal protection analysis,[28] we conclude that the plaintiffs do not state a plausible claim.

In order to evaluate whether the plaintiffs' complaint contains factual allegations plausibly suggesting that the statute violates the equal protection, we must determine the appropriate standard of review that would apply to their claim.

For purposes of equal protection analysis, strict scrutiny of a statute is appropriate where the statute either burdens a fundamental right or targets a suspect class. Goodridge, 440 Mass. at 330; Murphy v. Department of Correction, 429 Mass. 736, 739-740 (1999). Here, although the plaintiffs do not allege that a suspect class is involved, they argue that the charter

---

[28] "Classification, and differing treatment based on a classification, are essential components of any equal protection claim . . . ." Doe v. Acton-Boxborough Regional Sch. Dist., 468 Mass. 64, 75 (2014). On its face, the net school spending cap operates in a way to encourage more commonwealth charter schools in the plaintiffs' school district than in higher performing districts. See G. L. c. 71, § 89 (i) (subjecting most school districts to nine per cent net school spending cap for commonwealth charter schools while subjecting bottom ten per cent of districts to eighteen per cent net school spending cap). Under the plaintiffs' theory of discriminatory injury, they are part of the advantaged class associated with the statute's facial discrimination, and likely would not have standing to challenge it.

school cap statute deserves strict scrutiny because it burdens a fundamental right to education protected by the Massachusetts Constitution.[29]

We have had occasion to hold that the Massachusetts Constitution does not guarantee each individual student the fundamental right to an education in circumstances in which a student's behavior leads to expulsion. See Doe v. Superintendent of Schs. of Worcester, 421 Mass. at 129-130 (declining "to hold . . . that a student's right to an education is a 'fundamental right' which would trigger strict scrutiny analysis whenever school officials determine, in the interest of safety, that a student's misconduct warrants expulsion"). Although heightened scrutiny does not apply in the individual student misconduct context, whether the education clause implies heightened scrutiny of education-related discriminatory classifications in other circumstances is an open question. We need not determine whether such circumstances exist and, if so, what they might be, in order to conclude that heightened scrutiny does not apply to the charter school cap statute. See Lee v. Commissioner of Revenue, 395 Mass. 527, 530 (1985) (where

---

[29] In addition to those rights afforded explicit protection under our Constitution, "[h]istory and tradition guide and discipline" the process of identifying and protecting fundamental rights implicit in liberty. See Obergefell v. Hodges, 135 S. Ct. 2584, 2598 (2015); Gillespie v. Northampton, 460 Mass. 148, 153 (2011).

fundamental right is at issue, not every statute that affects that right must be supported by compelling State interest).

Under an equal protection analysis, only a statute that "significantly interfere[s] with" the fundamental right at issue burdens that right and justifies application of strict scrutiny. Zablocki v. Redhail, 434 U.S. 374, 386 (1978).[30]  Even if we were to conclude that circumstances exist where the Constitution protects a fundamental right to education, we do not think that the right could be characterized in such a manner that, on these alleged facts, the charter school cap statute interferes with it significantly.

The Legislature first created charter schools as laboratories only twenty-five years ago to accomplish purposes such as "simulat[ing] the development of innovative programs within public education" and "provid[ing] models for replication in other public schools."  G. L. c. 71, § 89 (b).  Although the charter school statute is simultaneously intended to provide

---

[30] In Zablocki v. Redhail, 434 U.S. 374, 387-388 & n.12 (1978), the Court considered "[t]he directness and substantiality of the interference" with a fundamental right in determining whether a statute significantly interfered with that right; however, under the Massachusetts Constitution, "it is unimportant whether the burden imposed is direct or indirect," because only the substantiality of the interference is relevant. Moe v. Secretary of Admin. & Fin., 382 Mass. 629, 652 (1981).

parents and students with greater options in selecting schools,[31] and to encourage and even pressure traditional public schools to innovate and improve,[32] the plaintiffs have no constitutional right to attend charter schools, and the charter school cap does not interfere with the students' ability to attend traditional public schools.  Where the charter school cap statute "neither burdens a fundamental right nor targets a suspect class," it is subject to rational basis review.  Murphy, 429 Mass. at 739-740; Lee, 395 Mass. at 532.

Under rational basis review, a law "will be upheld as long as it is rationally related to the furtherance of a legitimate state interest."  English v. New England Med. Ctr., Inc., 405 Mass. 423, 428 (1989), quoting Dickerson v. Attorney Gen., 396 Mass. 740, 743 (1986).  At the same time, under the Massachusetts Constitution, "equal protection analysis requires the court to look carefully at the purpose to be served by the statute in question and at the degree of harm to the affected class."  English, supra.

---

[31] See G. L. c. 71, § 89 (b) (including express purpose "to provide parents and students with greater options in selecting schools within and outside their school districts").

[32] See, e.g., G. L. c. 71, § 89 (i) (providing for higher net school spending cap in school districts that board determines among lowest ten per cent Statewide).

"[C]haracterizing the tests to be applied to determine the constitutional validity of legislation as '[rational basis]' and 'strict scrutiny' is shorthand for referring to the opposite ends of a continuum of constitutional vulnerability determined at every point by the competing values involved." Id. at 428-429, quoting Marcoux v. Attorney Gen., 375 Mass. 63, 65 n.4 (1978). This method of analysis highlights that the "rational basis test 'includes a requirement that an impartial lawmaker could logically believe that the classification would serve a legitimate public purpose that transcends the harm to the members of the disadvantaged class." English, supra at 429, quoting Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 452 (1985) (Stevens, J., concurring). That standard is met here.

Although the charter school cap cannot be said to burden any potential fundamental right, based on the facts alleged in the plaintiffs' complaint, the charter school cap nevertheless may impose a serious degree of harm on the plaintiffs and others in the plaintiffs' position given the nature of the educational interest at stake. The plaintiffs' educational interest is undeniably greater than an interest in operating a self-service gasoline station, see Shell Oil Co. v. Revere, 383 Mass. 682, 683 (1981); an interest in selling alcoholic beverages on Sundays, see Chebacco Liquor Mart, Inc. v. Alcoholic Beverages

Control Comm'n, 429 Mass. 721, 721-722 (1999); a math teacher's interest in not taking an assessment test prior to license renewal, see Massachusetts Fed'n of Teachers, AFT, AFL-CIO, 436 Mass. at 777; or an interest in possessing marijuana, see Commonwealth v. Leis, 355 Mass. 189, 195 (1969). See also Hancock, 443 Mass. at 485-486 (Ireland, J., dissenting), quoting Brown v. Board of Educ. of Topeka, 347 U.S. 483, 493 (1954) ("it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education"). However, the purposes of the charter school cap reflect a legislative attempt to balance the plaintiffs' strong educational interest with other interests that are just as strong. As a result, we conclude that no plausible set of facts exist to overcome the statute's presumption of rationality.

The charter school cap reflects the education interests of students in the Commonwealth who do not attend charter schools. As the Superior Court judge noted in this case, funding for charter schools necessarily affects the funding for traditional public schools. The cap is an effort to allocate education funding among all the Commonwealth's students attending these two types of publicly funded schools. Because of the statutory funding mechanism that mandates payment of charter school tuition from resources that would otherwise go to traditional public schools, the expansion of charter schools has detrimental

effects on traditional public schools and the students who rely on those schools and their services.  See G. L. c. 71, § 89. The process of balancing these competing values in education "calls for . . . legislative judgments as to the desirability, necessity, or lack thereof of" charter schools.  Zayre Corp. v. Attorney Gen., 372 Mass. 423, 437 (1977).  This attempt to allocate resources among all the Commonwealth's students represents the rational basis for the statutory cap.

There are other legitimate public purposes that would provide a rational basis for the statute as well.  For example, limits on charter schools may be based on a policy concern regarding the departure from local democratic control over public schools by local school committees because charter schools are instead governed by private boards of trustees. Additionally, a limit on charter school growth permits education administrators to assess, manage, and develop for replication any innovative educational practices that develop in charter schools for the students enrolled in traditional public schools. It cannot be said that these goals and the charter school cap are "so attenuated as to render the [cap] arbitrary or irrational."  Murphy v. Commissioner of the Dep't of Indus. Accs.  415 Mass. 218, 230 (1993), quoting Cleburne, 473 U.S. at 446.

The plaintiffs argue that the Legislature's specific decision to set the charter school cap at eighteen per cent of net school spending in their school district is irrational. However, "[l]egislative line drawing . . . does not violate equal protection principles simply because it 'is not made with mathematical nicety or because in practice it results in some inequality.'" Chebacco Liquor Mart, Inc., 429 Mass. at 723, quoting Dandridge v. Williams, 397 U.S. 471, 485 (1970).

Although deciding the issue whether a law is supported by a rational basis on a motion to dismiss rather than later in litigation may present the exception rather than the rule,[33] for the foregoing reasons, we conclude that the motion judge properly dismissed the equal protection claim because there is no plausible set of facts that the plaintiffs could prove to

---

[33] Compare Shell Oil Co. v. Revere, 383 Mass. 682, 688 n.11 (1981) ("we express no views on whether the judge could have granted summary judgment . . . [or] a motion to dismiss . . . rather than have a protracted hearing" on constitutional challenge that legislation was without rational basis [citations omitted]), with Marcoux v. Attorney Gen., 375 Mass. 63, 63-64, 71-72 (1978) (statute deemed constitutional on motion to dismiss).  See Polk Co. v. Glover, 305 U.S. 5, 6, 9-10 (1938) (per curiam) (motion to dismiss inappropriate way to resolve claim challenging constitutionality of State statute regulating labels of canned citrus fruit or juice).  But see Wroblewski v. Washburn, 965 F.2d 452, 459-460 (7th Cir. 1992) (noting that "[a] perplexing situation is presented when the rational basis standard meets the standard applied for dismissal under Fed. R. Civ. P. 12[b][6]" and "[t]o survive a motion to dismiss for failure to state a claim, a plaintiff must allege facts sufficient to overcome the presumption of rationality that applies to government classifications").

support a conclusion that the charter school cap does not have a rational basis.  See Iannacchino, 451 Mass. at 636 ("What is required at the pleading stage are factual allegations plausibly suggesting [not merely consistent with] an entitlement to relief" [quotations and citation omitted]).

Additionally, the Constitution demands respect for the products of the democratic process.  See Commonwealth v. Henry's Drywall Co., 366 Mass. 539, 544 (1974) ("It is not our function to consider the expediency of an enactment or the wisdom of its provisions").  As outlined supra, charter school funding and caps have been subject to frequent and intense scrutiny by the Legislature and the public at large,[34] see note 17, supra, with advocates advancing arguments on behalf of legitimate student interests on both sides.  Where a statute does not use a suspect classification or burden a fundamental right, is supported by a rational basis, and does not otherwise violate the Constitution, advocates may not turn to the courts merely because they are unsatisfied with the results of the political process.  See Zayre Corp., 372 Mass. at 433 ("principle of judicial restraint includes recognition of the inability and undesirability of the

---

[34] As discussed supra, a majority of voters, including those in the plaintiffs' own school district, recently rejected a ballot measure that would have provided similar relief.  See note 17, supra, and accompanying text; Election Statistics 2016, supra at 529, 534.

judiciary substituting its notions of correct policy for that of a popularly elected Legislature"); Commonwealth v. Perry, 155 Mass. 117, 123-125 (1891) (Holmes, J., dissenting) (emphasizing importance of judicial restraint when evaluating popular public policy).  See also Lochner v. New York, 198 U.S. 45, 74-78 (1905) (Holmes, J., dissenting) (stressing restraint from judicial adaptation of policies "which a large part of the country does not entertain").

Conclusion.  For the reasons stated above, we conclude that the plaintiffs failed to state a claim that G. L. c. 71, § 89 (i), violates the education clause or equal protection rights embodied in the Massachusetts Constitution.  The judgment of the Superior Court is affirmed.

So ordered.