NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12996

 REBECCA GROSSMAN & others[1] vs. SECRETARY OF THE COMMONWEALTH.


        Suffolk.     August 24, 2020. - August 26, 2020.

    Present:  Lenk, Gaziano, Lowy, Budd, Cypher, & Kafker, JJ.


Elections, Ballot, Primary.  Secretary of the Commonwealth.
     Constitutional Law, Elections.



     Civil action commenced in the Supreme Judicial Court for
the county of Suffolk on August 19, 2020.

     The case was reported by Kafker, J.


     Jeffrey S. Robbins for the plaintiffs.
     Anne Sterman, Assistant Attorney General, for the
defendant.
     The following submitted briefs for amici curiae:
     William G. Cosmas, Jr., for Robert Goldstein.
     Torey B. Cummings, Assistant United States Attorney, for
the United States.
     Matthew R. Segal, Ruth A. Bourquin, & Jessica J. Lewis for
American Civil Liberties Union of Massachusetts, Inc.
     Michael Walsh, pro se.


_____

     [1] Becky Grossman for Congress, Jonathan Levenfeld, Sophie
Kripp, and Shirley D. Grossman, on behalf of themselves and
others similarly situated.

KAFKER, J.  In response to the COVID-19 pandemic, the Legislature passed an emergency law designed to increase voting options in the September 1, 2020, primary election as well as the November 3, 2020, general election.  See St. 2020, c. 115. A prominent additional voting option included in the act is expansive voting by mail.  For the primary election, voters may apply for a "mail-in" ballot, so long as their application to vote by mail is received before 5 P.M. on Wednesday, August 26, 2020.  See St. 2020, c. 115, § 6 (e) (2).  Those mail-in primary election ballots must be completed and received by local election officials before 8 P.M. on September 1.See St. 2020, c. 115, § 6 (h) (3); G. L. c. 53, § 43.  The mail-in ballots can be returned by mail, dropped off in drop boxes provided by local officials, or hand-delivered to election officials.  See St. 2020, c. 115, § 6 (h) (1).  A voter who has requested a mail-in ballot can also choose to vote in person on either election day, as always, or between August 22 and 28, 2020, at early polling locations established pursuant to the act, in lieu of submitting his or her mail-in ballot.  See St. 2020, c. 115, § 7 (b) (1).

The plaintiffs, consisting of a candidate in the primary election, her campaign, and a few identified Massachusetts registered voters, contend that the September 1 deadline for the receipt of mail-in ballots significantly interferes with the

constitutional right to vote. They seek an order from this court requiring the Secretary of the Commonwealth (Secretary) to accept mail-in ballots that are received within ten days of the primary election, so long as those ballots are postmarked by September 1.[2]

Having reviewed the emergency law and its implementation by the Secretary, we conclude that the existing September 1 deadline is constitutional. The new law does not significantly interfere with the constitutional right to vote in the September 1 primary election. Rather, the legislation enhances the right to vote in the primary, as well as the general, election, by providing multiple means of voting, including options to vote by mail that previously never existed. The September 1 deadline for the receipt of mail-in and other ballots for the primary election is also reasonably designed to account for a number of time-sensitive legal requirements that follow shortly after the primary election, including those that provide for recounts and challenges, as well as the timely mailing of ballots to military

---

[2] At the time of their original complaint, three of the individual plaintiffs asserted that they had applied for, but not yet received, their mail-in ballots for the primary election. The Secretary has since averred that the ballots for two of these individual plaintiffs were mailed on August 15, 2020. The third plaintiff originally applied for an absentee ballot to be sent to her college, which was closed at the time. The Secretary has averred that she has since applied for, and been mailed, a second ballot at her local residence.

and overseas voters, which is required by Federal law. A time-defined primary election process, with reasonable deadlines, including the September 1 deadline at issue, is necessary to ensure not only compliance with Federal law but also full participation and a fair and orderly general election in November. Finally, for those who requested or received mail-in ballots very late in the process, there remain multiple alternatives to simply mailing back the ballots to ensure that one's vote is counted in the primary election. In sum, the new law enhances and does not diminish the means of voting in the primary election.[3]

Background. Effective July 6, 2020, the Legislature passed "An Act relative to voting options in response to COVID-19" (act). See St. 2020, c. 115. The act was intended to increase voting options for the 2020 elections in light of the safety risks posed by the COVID-19 pandemic. See id. Among other things, it decreases barriers to registering to vote, increases in-person voting options, calls for new safety protocols for in-person voting, expands the availability of absentee ballots, and implements a Statewide plan for voting by mail in the 2020

---

[3] We acknowledge the amicus letters submitted by Robert Goldstein, Michael Walsh, and the American Civil Liberties Union of Massachusetts, Inc., as well as the amicus brief submitted by the United States.

primary and general elections.  See St. 2020, c. 115, §§ 6 (b), 7, 15, 17, 18, 19.

1.  Applying to vote by mail.  The additional voting option at issue here allows any voter to cast his or her ballot by mail in the 2020 primary and general elections.  See St. 2020, c. 115, § 6 (b).  To do so, a voter must complete an application to vote by mail and return it to the city or town clerk's office before 5 P.M. on Wednesday, August 26, 2020.  See St. 2020, c. 115, § 6 (e) (1), (2).[4, 5]

Once a voter's application is received, a ballot is sent to the voter's address along with instructions and return envelopes with prepaid, first-class postage.  See St. 2020, c. 115, § 6 (e) (1), (g) (1).  The Secretary has created a ballot tracking database that allows voters to confirm in real time whether their application has been received, as well as the date

---

[4] Under the act, the Secretary was required to automatically disseminate applications by July 15, 2020 to all voters who registered to vote before July 1, 2020.  See St. 2020, c. 115, § 6 (d) (1).  The Secretary in fact sent out the applications one week later, on July 22, 2020.  Voters can also access the application form online.  See 2020 Vote by Mail Application, https://www.sec.state.ma.us/ele/elepdf/2020-Vote-by-Mail-Application.pdf [https://perma.cc/SY6A-RGS3].  An online application form may be returned by mail, facsimile, e-mail, or in-person delivery.  See id.

[5] Alternatively, voters who have timely submitted an application may choose to receive their ballot in person at the city or town clerk's office.  See St. 2020, c. 115, § 6 (e) (1), (g) (1).

on which their blank ballot was mailed to them.  See Secretary of the Commonwealth, Elections and Voting:  Track My Ballot, https://www.sec.state.ma.us/wheredoivotema/track/trackmyballot .aspx [https://perma.cc/5HCV-XGGE].  See also Secretary of the Commonwealth, Voting by Mail FAQ, https://www.sec.state.ma.us /ele/eleev/early-voting-faq.htm [https://perma.cc/85NL-LG5T].

2.  Completing and returning mail-in ballots.  Once voters receive and complete their mail-in primary election ballot, they may submit the ballot in one of three ways.  First, voters may physically bring the completed ballot to the city or town clerk's office or an early voting location.[6]  St. 2020, c. 115, § 6 (h) (1) (i).  See Secretary of the Commonwealth, Election Advisory # 20-01 (Aug. 17, 2020).  Second, voters may deposit their ballot into a secured municipal drop box provided by local election officials.  St. 2020, c. 115, § 6 (h) (1) (ii).  Third, voters may mail the ballot to the city or town clerk's office using the envelopes provided with the ballot.  St. 2020, c. 115, § 6 (h) (1) (iii).  Regardless of the method selected, the primary election ballot must be received by the city or town clerk's office before 8 P.M. on Tuesday, September 1, 2020, in

---

[6] Pursuant to guidance issued by the Secretary, ballots should not be submitted to polling locations on the actual election day itself, because such ballots must be checked at the local election office before they can be counted at a polling location.  See Secretary of the Commonwealth, Election Advisory # 20-01 (Aug. 17, 2020).

order to be counted.  See St. 2020, c. 115, § 6 (h) (3); G. L. c. 53, § 43.  Voters can also confirm that their completed ballot was received, and whether it was accepted or rejected, using the aforementioned ballot tracking database provided by the Secretary.  See Secretary of the Commonwealth, Voting by Mail FAQ, https://www.sec.state.ma.us/ele/eleev/early-voting-faq.htm [https://perma.cc/85NL-LG5T].

3.  In-person voting.  Voters who have not yet returned their completed primary election ballot also have the option of voting in person.  See St. 2020, c. 115, § 24.  The act provides, for the first time, for a seven-day in-person early voting period from August 22, 2020, to August 28, 2020. St. 2020, c. 115, § 7 (b) (1).  Additionally, voters may still vote in person on election day, September 1.  See St. 2020, c. 115, § 24.[7]

4.  Subsequent election deadlines.  After the September 1 primary election, a number of deadlines follow in the period before the general election.  On or before September 4, any recount petitions must be filed with election officials.  See St. 2019, c. 142, § 88.  On September 5, local election

_____

[7] The act also tasks the Secretary with promulgating emergency regulations to implement protective measures at the polls, including social distancing, personal protective equipment, and the use of hand sanitizers.  See St. 2020, c. 115, § 19.

officials must certify primary election results.  See G. L. c. 53, § 52.  Any recounts must be completed by September 12, and any challenges to nomination papers must be heard and adjudicated by the State Ballot Law Commission by September 14.  See St. 2019, c. 142, §§ 88, 90.  Subsequent to such recounts and adjudicatory decisions, the Secretary must prepare and print more than 500 different general election ballot styles required by all of the different districts and jurisdictions within the Commonwealth, and then disseminate them to local election officials by September 16 for distribution to military and overseas voters.  Under Federal law, these general election ballots for military and overseas voters must be distributed by local election officials by September 19, 2020.  See 52 U.S.C. § 20302(a)(8)(A).  See also St. 2019, c. 142, § 91.

5.  <u>Recent issues at the United States Postal Service</u>.  To the extent that ballot applications, mail-in ballots, and ballot return envelopes are transmitted by mail, the Secretary has directed that they be sent by the United States Postal Service (postal service) using first-class postage.  In a letter dated July 30, 2020, the general counsel for the postal service informed the Secretary of the potential effect of postal service processing times on the delivery of election materials.  The letter stated that certain Massachusetts "deadlines for requesting and casting mail-in ballots are incongruous with the

Postal Service's delivery standards."  The letter explained that most domestic first-class mail is delivered two to five days after it is received by the postal service.  Other mail is delivered more slowly.  The general counsel recommended that applications to vote by mail be submitted no later than fifteen days before election day, and completed ballots be mailed at least one week before election day.  Though the letter primarily addressed the feasibility of mail-in ballot deadlines pertaining to the 2020 general election, the primary election deadlines in Massachusetts also do not meet the general counsel's recommended timetable.  At the same time, however, the letter indicated that "the Postal Service is not purporting to definitively interpret the requirements of your state's election laws, and also is not recommending that such laws be changed to accommodate the Postal Service's delivery standards."  Rather, the letter stated that the postal service would be unable to adjust its delivery standards to accommodate the mail-in ballot deadlines.[8]

---

[8] More recently, on August 21, 2020, the Postmaster General of the United States testified before the United States Senate as to recent changes at the United States Postal Service (postal service).  See Boston Globe, Postmaster pledges to prioritize election mail, but offers no plan to ensure timely delivery (Aug. 21, 2020) https://www.bostonglobe.com/2020/08/21/nation /postmaster-testify-before-senate-amid-uproar-over-mail/ [https://perma.cc/G6KY-Z4V2].  The Postmaster General told senators that he was not yet able to provide a plan to ensure the timely delivery of election ballots.  Id.  At the same time, he stated that the postal service was "fully capable and committed" to delivering election materials on time.  Id.

Discussion. 1. Standard of review. The right to vote, expressly provided by both art. 3 of the Amendments to the Massachusetts Constitution[9] and art. 9 of the Massachusetts Declaration of Rights, [10] is fundamental. See Chelsea Collaborative, Inc. v. Secretary of Commonwealth, 480 Mass. 27, 32-33 (2018) ("the fundamental right to vote is also implicitly protected under other provisions of the Declaration of Rights"). At the same time, "the Constitution provides the Legislature with broad authority as part of the State's police power, to enact reasonable laws and regulations that are, in its judgment, appropriate." Id. at 33. See Opinion of the Justices, 368

---

[9] Article 3 of the Amendments to the Massachusetts Constitution provides:

"Every citizen of eighteen years of age and upwards, excepting persons who are incarcerated in a correctional facility due to a felony conviction, and, excepting persons under guardianship and persons temporarily or permanently disqualified by law because of corrupt practices in respect to elections who shall have resided within the town or district in which he may claim a right to vote, six calendar months next preceding any election of governor, lieutenant governor, senators, or representatives, shall have a right to vote in such election of governor, lieutenant governor, senators and representatives; and no other person shall be entitled to vote in such election."

[10] Article 9 of the Massachusetts Declaration of Rights provides:  "All elections ought to be free; and all the inhabitants of this commonwealth, having such qualifications as they shall establish by their frame of government, have an equal right to elect officers, and to be elected, for public employments."

Mass. 819, 821 (1975) ("The court has sustained statutes which reasonably regulate elections . . .").

Whenever we evaluate the constitutionality of a restriction on the right to vote, we apply a "sliding scale approach, . . . through which [we] weigh the character and magnitude of the burden the State's rule imposes on the plaintiffs' rights against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary." Goldstein v. Secretary of the Commonwealth, 484 Mass. 516, 524 (2020), quoting Libertarian Ass'n of Mass. v. Secretary of the Commonwealth, 462 Mass. 538, 560 (2012).[11] "Because the right to vote is a fundamental one protected by the Massachusetts Constitution, a statute that significantly interferes with that right is subject to strict judicial scrutiny" (citations omitted). Chelsea Collaborative, Inc., 480 Mass. at 33. "By contrast, statutes that do not significantly interfere with the right to vote but merely regulate and affect

---

[11] As discussed in Chelsea Collaborative, Inc. v. Secretary of the Commonwealth, 480 Mass. 27, 34-35 (2018), the "sliding scale" approach originates from Federal constitutional jurisprudence. However, as the court went on to note, "there may be circumstances where the Massachusetts Declaration of Rights and art. 3 require application of this analysis in a manner that guards more jealously against the exercise of the State's police power than the application of the framework under the Federal Constitution" (quotation and citation omitted). Id. at 35.

the exercise of that right to a lesser degree are subject to rational basis review to assure their reasonableness." Id.at 34.[12]  Here, the parties dispute the standard of review that should apply to the September 1 deadline established under the act, with the plaintiffs urging that it is strict scrutiny, and the Secretary that it is rational basis.  Our first task, therefore, is to resolve that issue.

2.  The burden of the September 1 deadline on the right to vote.  The plaintiffs argue that the September 1 deadline imposed under the act is a significant burden on their right to vote by mail.  There are multiple problems with this argument.  First, there is no constitutional right to vote by mail.  There is, rather, a more general constitutional right to vote.  Second, voters, including those who have requested mail-in ballots, have multiple voting options, and thus are not limited to returning their ballots by mail.  Third, reasonable, firm deadlines for voting are necessary, particularly in the primary election process which must be completed in a timely manner to ensure an orderly general election.  For all of these reasons, as more fully discussed infra, we conclude that the September 1

---

[12] As the court noted in Chelsea Collaborative, Inc., 480 Mass. at 36 n.22, "rational basis" and "strict scrutiny" are "shorthand for referring to the opposite ends of a continuum of constitutional vulnerability determined at every point by the competing values involved" (citations omitted).

deadline for voting, which applies equally to voting by mail as well as in-person voting, does not significantly burden the right to vote given the multiple options available to voters, including those who have requested mail-in ballots.

We begin by emphasizing that the expansion of the right to vote, by providing multiple voting options, was the Legislature's express purpose in adopting the act. See St. 2020, c. 115, preamble ("Whereas, The deferred operation of this act would tend to defeat its purpose, which is to forthwith provide for increased voting options in response to COVID-19, therefore it is hereby declared to be an emergency law, necessary for the immediate preservation of the public health and convenience" [emphasis added]).

Prior to the adoption of the act, voters effectively had two options for voting in a State primary election. If they had a recognized excuse for not being able to vote in person on the date of the primary election, namely, a physical disability, religious objection, or absence from the Commonwealth, they could vote in advance using an absentee ballot. See G. L. c. 54, § 86. Otherwise, they had to vote in person. In recognition of the COVID-19 pandemic and the potential impact that it might have on the ability or desire of voters to appear in person to vote at a polling location, the Legislature (and the Governor) acted on July 6, 2020, to create a number of new

voting options in time for the September 1 primary election, as well as for the general election that follows on November 3. For the first time, voters can now vote in a primary election in person at early polling locations.[13] Early in-person voting commenced on August 22, and is ongoing through August 28. In addition, the act provided primary election voters, again for the first time, with the option of "no excuse" voting by mail, the option at issue here. As to that option, the act also provided several different ways for voters to submit their mail-in ballot so that it is received on or before the September 1 deadline, only one of which requires reliance on the postal service. See Chelsea Collaborative, Inc., 480 Mass. at 39 (describing widespread accessibility of voter registration process). While voters do have the option of returning their ballot by mail, using the first-class postage-prepaid envelope provided by the Secretary for that purpose, they also can (1) deliver it in person to their city or town clerk's office, (2) deposit it in a secure drop box, if one is available in their city or town, or (3) deliver it in person to one of the aforementioned early polling locations or the city or town clerk's office. Of course, voters also still have the option of

---

[13] In 2014, the Legislature authorized limited early voting in State biennial elections, but not primaries. See St. 2014, c. 111, § 12.

voting in person on September 1, in lieu of submitting their mail-in ballot.  Thus, when the act is examined as a whole, there can be no doubt that voters now have many more options for voting in the primary election than existed prior to the passage of the act, and multiple means of delivering their mail-in ballot before the September 1 deadline.

This is not to suggest that the emergency act was prescient and anticipated all of the potential problems arising from the COVID-19 crisis.  In its effort to support applications and voting by mail, the Legislature may have been overly optimistic to expect that mail-in ballots could be requested by voters as late as August 26, be filled out and mailed back by voters, and be received by election officials on or before the September 1 deadline.  The Legislature certainly could not have anticipated the recent postal service problems.  With that said, the Legislature did not leave the right to vote dependent on the vagaries of postal service efficiency.  The act provided voters with the opportunity to request mail-in ballots well before the August 26 deadline; while there was some initial delay in getting the applications for mail-in ballots out to registered voters, they did go out by July 22, well over a month before the August 26 deadline.  Moreover, the Secretary's website allows voters to track the receipt of their application, the date that their blank ballot is mailed, and the date that their completed

ballot is received.  For those voters who have experienced delays in receiving their mail-in ballots after applying for them, or for those who have not yet received or even applied for ballots, they have other options, as outlined supra, for making sure their ballot is received, or otherwise exercising their right to vote, by the September 1 deadline.

Nor do we minimize the importance of voting by mail, especially during the ongoing COVID-19 pandemic.  For many voters, including those over the age of sixty-five and those with pre-existing conditions, for whom the coronavirus has proved so lethal, voting with minimal or no personal contact is rightly viewed as their only option.  The act, however, took this into account.  It provided, for the first time, for the option of a "no excuse" mail-in primary election ballot.  And while it extended the deadline for requesting and returning such a ballot perhaps too close to the due date to encourage this option, the over-all mail-in ballot process was laudable and reasonable.  Still further, the Legislature built in other contactless options, such as the use of drop boxes, for voters to use if they were not prepared or able to return their mail-in ballots by the September 1 deadline through the postal service. By providing all of these expanded voting options for the primary election, the Legislature did act to try to reduce the number of voters who would need to appear in person at polling

locations, either on election day or for early voting, which, in turn, one would reasonably expect to reduce the potential risk for the spread of the coronavirus. Understandably, that will not make polling locations sufficiently "safe" for all voters, especially the most vulnerable, but it is another example of how the act has enhanced, not burdened, the right to vote during these unprecedented times.

Deadlines are also a necessary part of the election process, particularly the primary election, which must be completed in a timely fashion to set the stage for the general election. See Chelsea Collaborative, Inc., 480 Mass. at 41. The question then becomes whether the particular deadline selected nonetheless constitutes a significant burden on the exercise of the constitutional right. In making this determination, we look to the statutory scheme as a whole. As discussed supra, there are a number of State and Federal statutory election deadlines that follow the September 1 primary election and other preparations that must be undertaken to effectuate the general election that takes place shortly after it. Most notably, by Federal law, general election ballots must be distributed to military and overseas voters by local election officials by September 19. See 52 U.S.C. § 20302(a)(8)(A). See also St. 2019, c. 142, § 91. To comply with this deadline, the Secretary must complete the general election ballots and provide

them to local election officials by September 16.  For the upcoming general election, this involves preparing and printing the more than 500 unique ballot styles necessitated by all of the different electoral districts and jurisdictions within the Commonwealth.  Before that can happen, however, local election officials must certify primary election results, which will not occur for this primary election until September 5.  See G. L. c. 53, § 52.  In the meantime, recounts may be demanded by September 4, but not resolved until as late as September 12. St. 2019, c. 142, § 88.  There is also the possibility for objections to nominations, which may be heard and adjudicated by the State Ballot Law Commission as late as September 14.  See St. 2019, c. 142, § 90.  In effect, therefore, the Legislature had to consider and balance dueling voting rights when it came to setting a deadline for the receipt of mail-in ballots for the September 1 primary election, so as not to disenfranchise voters during the primary election but also not to disenfranchise voters in the general election that follows.

Based on the aforementioned circumstances and their particular relevance to this primary election, we conclude that the September 1 deadline established under the act for the receipt of mail-in and all other ballots does not significantly interfere with the fundamental right to vote under the Massachusetts Constitution so as to require the application of

strict scrutiny.  Therefore, we apply the rational basis test to determine its reasonableness.

3.  Rational basis review of the September 1 deadline.  "As a matter of due process, rational basis analysis requires that statutes bear a real and substantial relation to the public health, safety, morals, or some other phase of the general welfare" (quotation and citation omitted).  Chelsea Collaborative, Inc., 480 Mass. at 40.  Additionally, "[a]s a matter of equal protection, the rational basis test includes a requirement that an impartial lawmaker could logically believe that the classification would serve a legitimate public purpose that transcends the harm to the members of the disadvantaged class" (quotation and citation omitted).  Id.  In making this assessment, we operate from the "strong presumption that the Legislature does not act arbitrarily."  Id. at 45.  On the record before us, it is apparent that it did not.

As discussed at length supra, the September 1 deadline for the counting of ballots is reasonable in light of the numerous State and Federal statutory election deadlines that follow the September 1 primary election and the other matters that must be addressed to effectuate the general election that follows.  In the Legislature's estimation, the existence of these deadlines and other matters, which either must or may need to be satisfied to allow the general election that follows to proceed, made it

unfeasible to provide for the post-election day receipt of mail-in ballots in connection with the September 1 primary election.

In this regard, the present case resembles the Chelsea Collaborative case.  There, the court considered a similar constitutional challenge to a statute that required individuals to register to vote no later than twenty days before the election.  See Chelsea Collaborative, Inc., 480 Mass. at 28.  In so doing, the court weighed the fundamental right to vote against the various other responsibilities that government officials had to attend to between the deadline and the date of the election:

> "Local election officials are responsible for processing voter registration applications, screening them for errors, and confirming voter qualifications.  During the time immediately preceding an election, elections officials have a variety of tasks in addition to processing these forms.  For example, these administrators must recruit and train poll workers, test elections-related machines, and print voter lists prior to the commencement of election day voting."

Id. at 41.  In light of this, the court found that there was "ample evidence" that it would be rational for the Legislature to conclude that a deadline was necessary prior to election day to achieve the "legitimate public purposes" of "conducting orderly and legitimate elections."  Id. at 40-41.  The court then went on to conclude that, "at least for the time being, an impartial lawmaker could logically believe that the voter

registration deadline imposed twenty days prior to election day still serves legitimate public purposes that transcend the harm to those who may not vote." Id. at 46.

For their part, the plaintiffs in the present case suggest that the potential that some of the aforementioned events and deadlines will even occur or become relevant following the September 1 election is speculative and, based on past history, unlikely or at least manageable. They also suggest that the Secretary could have sought an exemption from the forty-five day military and overseas voter deadline, as permitted by law under certain circumstances. The Legislature and the Secretary must, however, prepare and provide time for recounts and contested nominations. They do not have the luxury of counting on them not to occur. A request for exemption from the Federal deadline, meanwhile, may or may not be granted. In crafting the act, the Legislature chose not to leave this to chance or conjecture, which certainly is not an irrational choice.

In considering the reasonableness of the September 1 deadline for the receipt of mail-in ballots, we are also mindful that with the dramatic expansion of voting by mail introduced under the act comes the potential for more complicated issues if there is a challenge to those ballots. Thus, the fact that challenges may have been resolved in the past in a certain number of days does not mean they will be resolved as quickly in

this new mail-in ballot world.  We are also mindful, as the Legislature no doubt was, that any challenge will be playing out in the midst of a pandemic.

For all these reasons, we conclude that the Legislature acted rationally when it concluded that a September 1 deadline for the receipt of mail-in ballots in the primary election was necessary to achieve the legitimate public purposes of conducting orderly primary and general elections during this particular election cycle.[14]

Conclusion.  For the reasons discussed, we conclude that the September 1 deadline for receipt of mail-in primary election ballots is not unconstitutional.

So ordered.

---

[14] While we have concluded that the statutory September 1 deadline only needs to satisfy the rational basis standard, it also likely would satisfy a strict scrutiny analysis, see Chelsea Collaborative, Inc., 480 Mass. at 35 (to satisfy strict scrutiny, regulation "must be narrowly tailored and advance a compelling state interest"), as well as the intermediate level of scrutiny -- "less exacting than strict scrutiny but more searching than mere rational basis review" -- advocated by the concurrence in the Chelsea Collaborative decision.  See id. at 53 (Gants, C.J., concurring) (which "would consider whether the Commonwealth's asserted interests in imposing the restriction are legitimate, whether the restriction in fact serves those interests, and whether the restriction is 'precisely drawn' to do so, weighing each of these factors in order to ascertain whether the burden on voting rights is justified").